UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

DAKOTA HATTON,

Plaintiff,

v.                                                    Civil Action No.:

KAMPGROUNDS OF AMERICA, INC. dba
TERRAMOR OUTDOOR RESORT BAR
HARBOR,

Defendant

<u>COMPLAINT</u>
<u>JURY TRIAL REQUESTED</u>
<u>INJUNCTIVE RELIEF REQUESTED</u>

1.      NOW COMES the Plaintiff, Dakota Hatton ("Plaintiff" or "Mr. Hatton"), by and

through his undersigned counsel, and complains against Defendant, Kampgrounds of America,

Inc. dba Terramor Outdoor Resort Bar Harbor ("Defendant", "Terramor", or "KOA") as follows:

<u>JURISDICTION AND PARTIES</u>

2.      This case arises under the Maine Human Rights Act ("MHRA"), 5 M.R.S. §4551

*et seq.*; the Maine Whistleblowers Protection Act ("MWPA"), 26 M.R.S. §831 *et seq.*; Title VII of

the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Family and Medical Leave Act

("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; and the Americans with Disabilities Act ("ADA"), 42

U.S.C. §§ 12101 *et seq.*.

3.      Dakota Hatton is a United States citizen residing in the City of Ellsworth, County

of Hancock, State of Maine.

4.      Terramor Outdoor Resort is a luxury "glamping" resort.

5.      The Terramor brand is owned and operated by the company Kampgrounds of

America ("KOA").

6.      KOA had over 500 employees at all times relevant to this matter.

7.      KOA had over 50 employees whose principal workplace was within 75 miles of Mr. Hatton's work location in 22 or more calendar weeks in 2022 and/or 2023.

8.      This Court has subject matter jurisdiction over Plaintiff's federal and state claims pursuant to 28 U.S.C. §§ 1331, 1332, and 1367.

9.      On or about January 16, 2024, Mr. Hatton filed a timely Complaint/Charge of Discrimination against KOA alleging unlawful discrimination and retaliation with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC").

10.      On or about August 5, 2025, the MHRC issued a Notice of Right to Sue with respect to Mr. Hatton's state law claims.

11.      On or about August 6, 2025, the EEOC issued a Notice of Right to Sue with respect to Mr. Hatton's federal law claims.

12.      Mr. Hatton has exhausted his administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

13.      Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

14.      Gretchen Chauncey was the General Manager of Terramor when Mr. Hatton was hired.

15.      Mark Swauger became the General Manager of Terramor beginning on June 26, 2023.

16.     Between Ms. Chauncey and Mr. Swauger, there were two other General Managers who either resigned or were terminated.

17.     Jenny McCullough was the Senior Director of Marketing and Operations at Terramor during Mr. Hatton's employment. She was Mr. Hatton's direct supervisor.

18.     Mr. Hatton was a contracted vendor of KOA Oceanside from 2016 to 2021 through his business, Maine Bakes.

19.     In September 2019, Mr. Hatton was offered a vendor contract by KOA to run the newly opened restaurant at the campground beginning in August 2020.

20.     On December 24, 2020, Mr. Hatton was offered a job working directly for KOA Terramor as the Food and Beverage Director. This new position came with full health benefits, housing, and a bonus. He received a $50,000 salary.

21.     On August 28, 2021, Mr. Hatton received a raise of $15,000, making his annual salary $65,000.

22.     In February 2023, Mr. Hatton was promoted to Assistant General Manager of Terramor. He received a $2,000 raise, making his yearly salary $67,000.

23.     When Mr. Hatton was promoted to Assistant General Manager, he was told that he would function as Interim General Manager for a period and would then be promoted to General Manager in 2024. Mr. Hatton was also promised paid education.

24.     Mr. Hatton worked as Assistant General Manager for one and a half months without a General Manager on staff until  Terramor hired Mr. Swauger on June 26, 2023.

25.     On June 24, 2023, an employee reported to Mr. Hatton that he had witnessed underage drinking in the employee housing.

26.    On June 25, 2023, Mr. Hatton addressed the underage drinking in a weekly managers' meeting. In the weekly managers' meeting, Mr. Hatton, Jeremy Benda (Front Desk Manager), Omar Arar (Maintenance Manager), and Richard Porter (Housekeeping Manager) discussed the underage drinking and made a plan for how they would address the issue.

27.    On this same day, Mr. Hatton also sent a message to all staff which included the following:

> *ATTENTION - A situation was brought to my attention. This message is a reminder of our policy in place & THE LAW.*
>
> *1. No underage drinking is allowed (anywhere) especially on company property. Consider this as a first & final warning.*
>
> *• The individuals will be immediately terminated as well as banned immediately and permanently from company property.*
>
> *2. No supplying underage drinking is allowed (anywhere) especially on company property. Consider this as a first & final warning.*
>
> *• The person who supplied alcohol to minors will be immediately terminated as well as banned immediately and permanently from company property.*
>
> *A minor caught in the act and or the supplier caught in the act -will have to deal with authorities who will be contacted immediately.*

28.    Mr. Hatton made his reports to employees and managers regarding underage drinking because he wished to shed light on the issue and to prevent unlawful underage drinking in the future.

29.    During the time that underage drinking was reported, there was not a General Manager on staff for Terramor.

30.    On June 26, 2023, the day after sending this message to Terramor staff, Mr. Hatton met with Ms. McCullough and alerted her to the underage drinking situation.

31.     Ms. McCullough informed Mr. Hatton that she would call an all-staff meeting to address this issue.

32.     When the underage drinking was initially reported to Mr. Hatton, Ms. McCullough was on vacation. She had taken time off to spend with her family.

33.     Mr. Hatton, having addressed the issue with other managers and having sent a message out to all employees, did not feel that the situation warranted interrupting Ms. McCullough`s vacation. The situation had been adequately addressed and could wait two more days, until the end of Ms. McCullough's vacation, to report it to her.

34.     Mr. Hatton addressed the reports of underage drinking with other members of management, with all Terramor employees, and with Ms. McCullough after she returned from vacation.

35.     Mr. Hatton made his reports to employees and managers regarding underage drinking because he wished to shed light on the issue and to prevent unlawful underage drinking in the future.

36.     Mr. Hatton's reports constituted protected activity.

37.     On June 27, 2023, the state liquor inspector informed Mr. Hatton that they received a complaint of underage drinking at Terramor staff housing.

38.     The liquor license at Terramor was in Mr. Hatton's name. Although the liquor license would typically be in the name of the General Manager, Mr. Hatton had been asked to sign for the license while Terramor was in-between General Managers.

39.     Mr. Hatton was aware that if Terramor had a liquor license violation, he might be subjected to fines and/or jail time because the license was in his name.

40.     Mr. Hatton asked Ms. McCullough for help with this situation, and she instructed him to write an incident report and send it only to her, not to Human Resources.

41.     On June 28, 2023, at an all-staff meeting, Ms. McCullough and Mr. Swauger addressed the underage drinking issues.

42.     On June 29, 2023 Ms. McCullough informed Mr. Hatton that Jaymin Keene had been identified as the person supplying alcohol to underage employees. Ms. McCullough informed Mr. Hatton that Mr. Keene had been seen distributing beer at a staff bonfire.

43.     Mr. Keene was banned from all employee housing.

44.     After Mr. Keene was accused of providing minors with alcohol, Ms. McCullough informed Mr. Hatton that Mr. Keene was not permitted to be anywhere near employee housing, but that he could still visit "Red Roof" (management housing), the lodge, and other public areas within Terramor.

45.     Mr. Hatton clarified with Ms. McCullough that Mr. Keene would still be permitted at the lodge at Terramor, because he knew it would be impossible to have an employee who was not permitted at the lodge.

46.     Red Roof is on the opposite side of Terramor's property from the employee housing, which is where any underage employees lived.

47.     Red Roof is not within eyesight of employee housing. It is located behind the main lodge and is on a different road than employee housing.

48.     Red Roof was where managers, including Mr. Hatton, lived. Attached to the building was also an office for employees to utilize and a garage used for maintenance and storage. This building is a high-traffic zone for Terramor employees.

49.     There were no restrictions in place about who could be invited to Red Roof. Managers were permitted to bring guests over whenever they wished.

50.     On many occasions, Ms. McCullough herself would attend informal dinner parties at Red Roof when she was on-site at Terramor.

51.     Mr. Hatton hosted Mr. Keene at Red Roof on various occasions. This was fully endorsed and permitted by Ms. McCullough.

52.     Mr. Hatton was not in violation of any rules, policies, or laws in inviting Mr. Keene to his home.

53.     Mr. Hatton was never told that he was not permitted to associate with Mr. Keene.

54.     Further, Mr. Keene remained employed by Terramor even after he was accused of furnishing alcohol to minors.

55.     On July 3, 2023, two male employees reported to Mr. Hatton that two female employees had been inappropriately touched by Mr. Swauger.

56.     This report came two weeks after Mr. Swauger was hired by Terramor. Up until this time, Ms. McCullough had been present overseeing Mr. Swauger's training. It was the first week that Mr. Swauger and Mr. Hatton were working without Ms. McCullough's oversight.

57.     Mr. Hatton met with the female employees, who detailed the sexual harassment they had experienced. They explained that Mr. Swager had touched them on their shoulders and breasts, would stand very close to them, and was very "touchy feely".

58.     The same day that he was made aware, Mr. Hatton reported the sexual harassment to Ms. McCullough and told her that multiple employees had made reports about Mr. Swauger's inappropriate conduct.

59.     Ms. McCullough's initial response was that she thought the behavior would fade out and was likely just due to Mr. Swauger's age and the fact that he was new. She told Mr. Hatton that Mr. Swauger had touched her shoulders while she was training him, and that she did not find it problematic.

60.     Mr. Hatton is not aware of any steps taken by Terramor in connection with the allegations that Mr. Swauger sexually harassed these employees. Mr. Hatton does not believe that Ms. McCullough passed his report on to Human Resources.

61.     Mr. Hatton was never asked to provide a written report about the sexual harassment complaint.

62.     To the best of Mr. Hatton's knowledge, Ms. McCullough did not create an incident report about this allegation of sexual harassment.

63.     About four days after making this report, the employees who had been harassed asked Mr. Hatton for an update on how the situation was being handled.

64.     After Mr. Hatton was suspended, these employees contacted Human Resources themselves.

65.     Mr. Hatton reported the allegations of sexual harassment to Ms. McCullough because he wanted to shed light on what he believed to be unlawful and unwelcome behavior by Mr. Swauger and because Mr. Hatton wanted to ensure that the alleged sexual harassment did not continue.

66.     Mr. Hatton is aware of multiple other instances of sexual harassment being discredited or swept under the rug at Terramor:

    a.   In 2021, Assistant General Manager Stephanie Phippen reported that Manager Joe Lorusso had been accused of sexual harassment by multiple employees. A

week after making this report, both Ms. Phippen and Mr. Lorusso were
terminated.

    b.    In 2023, Lisa Renult (a Terramor employee) reported that she had been
frequently touched by Mr. Swauger. Human Resources informed Ms. Renult that
Mr. Swauger had been "spoken to" and that he had watched a sexual harassment
training video.

    c.    Spencer Dominy and Joseph Doherty, both Terramor employees, reported that
they had witnessed Mr. Swauger touching female employees.

67.    There is a clear, pervasive pattern of sexual harassment at Terramor, which Mr.
Hatton stood up against and opposed.

68.    On July 6, 2023, Mr. Lombardi, Mr. Keene, Mr. Keene's father, and Mr. Hatton all
went swimming together. That afternoon, Mr. Hatton invited the group over to Red Roof for dinner.

69.    Mr. Hatton's  invitation of Mr. Keene over for dinner was not in violation of any
rules, policies, or laws. Mr. Hatton was aware that Mr. Keene was permitted to visit Red Roof and
was only banned from employee housing.

70.    At this dinner, Mr. Hatton discovered that Mr. Keene had been terminated. He was
not aware of this prior to July 6, 2023.

71.    Mr. Lombardi had a prior commitment and could not attend dinner, so he left but
agreed to return and pick up Mr. Keene and Mr. Keene's father later that night so that they could
stay for dinner.

72.    Mr. Lombardi left, then arrived at Red Roof after the group had finished dinner,
stayed for about 20 minutes, then drove Mr. Keene and Mr. Keene's father home.

73.     Mr. Lombardi was not present at dinner, where the other (of-age) members of the group consumed alcohol. Mr. Lombardi did not drink while at Red Roof.

74.     Ms. McCullough claims that on July 6, 2023, she received a report that there was underaged drinking occurring at Red Roof, where Mr. Hatton was living.

75.     On July 7, 2023, Mr. Hatton was suspended pending HR investigation.

76.     Mr. Hatton's suspension was in retaliation for his reporting sexual harassment the week prior.

77.     Mr. Hatton was informed of his suspension by Mr. Swauger, who told him that he was being placed on suspension, and directed him not to show up at work or answer his phone.

78.     Mr. Swauger also informed Mr. Hatton that Ms. McCullough would follow up with him on Monday to schedule a meeting and discuss the circumstances of his suspension.

79.     The fact that Mr. Swauger was involved in the decision to suspend Mr. Hatton just days after Mr. Hatton had made protected reports regarding Mr. Swauger's alleged sexual harassment of female employees is evidence that the wrongful suspension (and subsequent demotion) was motivated by retaliatory animus.

80.     Terramor was negligent and reckless in permitting Mr. Swauger to be involved in disciplining Mr. Hatton just days after Mr. Hatton reported allegations regarding Mr. Swauger allegedly engaging in sexual harassment.

81.     Mr. Hatton was suspended on a Friday and was not given any details about his suspension until the following Monday.

82.     Mr. Hatton was not told why he was under investigation until Monday, July 10, 2023.

83. On July 10, 2023, Mr. Hatton had a meeting with Ms. McCullough, Mr. Swauger, and HR. He was informed that he was under investigation for allowing underage drinking to occur in company housing.

84. No other accusations were mentioned at this time.

85. Until this meeting, Mr. Hatton did not know why he was being investigated.

86. In this meeting, Mr. Hatton informed Ms. McCullough and Barbara Ward, a Human Resources representative, that he did not allow underage drinking to occur and that he had recently sent a message to all staff members warning them of the consequences of underage drinking.

87. On July 14, 2023, Mr. Hatton had his second meeting with Ms. McCullough, Mr. Swauger, and Ms. Ward. During this meeting, he received a final warning, was demoted to Food and Beverage Manager, and was offered a decreased salary of $57,500.

88. Mr. Swauger participated in these meetings along with Ms. McCullough and Ms. Ward.

89. It was not until his second meeting that Mr. Hatton was accused of adding unpaid meal breaks to employee time sheets, sharing confidential information with employees, and failing to report employee complaints of inappropriate comments.

90. Mr. Hatton was trained by the previous General Manager to manually input thirty-minute breaks for employees into payroll. HR never told Mr. Hatton that he should input breaks differently.

91. Mr. Hatton had only been responsible for scheduling and payroll for about 6 weeks, during the time that Terramor didn't have a General Manager, and his training on these subjects was some limited training from the General Manager on their last day of work.

92.    Mr. Hatton was not permitted to speak or respond to these allegations, and he was very surprised by them.

93.    Mr. Hatton was not given an opportunity to speak throughout the two meetings.

94.    The reasons listed on Mr. Hatton's final warning include:

    a.   inadequately responding to underage drinking;

    b.   allowing a staff member who had provided underage employees with alcohol onto the premises of the manager's house;

    c.   inappropriately addressing a complaint of sexual harassment;

    d.   and failing to bring the sexual harassment to Ms. McCullough's attention.

95.    As discussed above and below, the allegations in the final warning were false and misleading and were clearly an effort to dissemble the facts to cover up a retaliatory purpose.

96.    Mr. Hatton's demotion was retaliation for reporting underage drinking and sexual harassment. This is a violation of the MWPA, MHRA, and Title VII.

97.    Terramor did not provide any evidence to support the allegation that Mr. Hatton was responsible for and/or complicit in any instance of alleged underage drinking.

98.    Mr. Hatton appropriately handled all reports of underage drinking that were brought to his attention and took these reports very seriously.

99.    Mr. Hatton was not responsible for the behavior of Terramor employees after hours. He could not control the choices of underage employees to consume alcohol but did warn these employees of the consequences if they chose to do so.

100.    It was the responsibility of the General Manager at Terramor to oversee employee housing after hours.

101.    Mr. Hatton was never asked to oversee the employee housing after hours.

102.    During the MHRC investigation it became clear that the allegations which Defendant provided to justify its suspension and demotion of Mr. Hatton were not supported by evidence but rather reflected rumors that employees heard from unnamed persons.

103.    It is implausible that Defendant would have suspended and demoted a good manager based on uninvestigated speculation and rumors and this is additional evidence of pretext.

104.    On July 16, 2023, Mr. Hatton requested unpaid leave under the FMLA due to an upcoming MRI to diagnose a heart condition he was experiencing.

105.    Mr. Hatton spoke with Mr. Swauger about his doctors' appointments and the time he would need off.

106.    On July 18, 2023, after his doctor's appointment, Mr. Hatton submitted his doctor's note and FMLA documentation to HR. He also informed Ms. McCullough and Ms. Ward about his medical condition.

107.    Mr. Hatton's request for time off was protected under the FMLA, MHRA and the ADA.

108.    On July 24, 2023, Mr. Hatton submitted an appeal for his demotion and informed Ms. McCullough and HR that he would not sign the disciplinary action slip.

109.    Mr. Hatton denied every allegation against him and reiterated his passion for working at Terramor.

110.    Mr. Hatton's appeal was six pages long and explained the appropriate responses he had made to reports of illegal drinking, sexual harassment, and an employee furnishing alcohol to minors.

111.    Mr. Hatton provided Ms. McCullough, Ms. Ward, and Mr. Swauger with a detailed description of his actions during each day on which he was accused of inappropriate behavior.

112.    Mr. Hatton's appeal provided details regarding reports that he had made and conversations that he had documented, including dates and times.

113.    Mr. Hatton submitted his appeal because he believed that the discipline and demotion were unfounded, that he was being retaliated against for reporting and opposing underage drinking and the allegations of Mr. Swauger's sexual harassment, and that, by providing the facts and context, he would shed light on the retaliation and hopefully persuade his employer to change course.

114.    Mr. Hatton's appeal letter was a protected report for purposes of the MHRA, MWPA, and Title VII.

115.    On July 26, 2023, Ms. McCullough emailed Mr. Hatton to inform him that his appeal had been denied.

116.    Mr. Hatton was told that he needed to return to work on July 31 at 8:00 am and that if he did not report to work, Terramor would accept his resignation.

117.    Mr. Hatton would still be out on FMLA leave on July 31, and Ms. McCullough knew he would be out on protected FMLA leave. This constitutes unlawful FMLA interference.

118.    Ms. McCullough informing Mr. Hatton that he needed to return to work prior to the end of his FMLA leave constitutes discrimination against Mr. Hatton because of his disability and request for accommodation for the purposes of the MHRA and ADA and further retaliation against Mr. Hatton for utilizing protected leave and for reporting sexual harassment and underage drinking.

119.    On July 30, 2023, Mr. Hatton agreed to work as the Food and Beverage Manager and signed his new contract.

120.    On July 31, 2023, Mr. Hatton was diagnosed with Hypertrophic Cardiomyopathy. His doctor provided him with completed FMLA forms, which he submitted to his employer.

121.     Mr. Hatton requested FMLA leave from August 1, 2023 to October 24, 2023.

122.     On August 1, 2023, HR approved Mr. Hatton's FMLA leave from August 1 to October 24.

123.     From September 18, 2023 through September 20, 2023, Mr. Hatton had appointments with doctors who specialize in Hypertrophic Cardiomyopathy. These doctors issued updated FMLA paperwork permitting him to return to work on October 6, 2023 two weeks earlier than his originally scheduled October 20 return-to-work date.

124.     These doctors also gave Mr. Hatton a restriction of not being able to work more than 40 hours per week and not being able to lift  more than 50 pounds.

125.     Mr. Hatton informed Respondent of his work restrictions on or around September 20, 2023.

126.     Hypertrophic Cardiomyopathy is a life threating condition and one of its symptoms is sudden death.

127.     Mr. Hatton requires medication to control his heart rate and blood pressure, and he must undergo frequent testing to ensure that the medication is working as it should.

128.     Other symptoms of Hypertrophic Cardiomyopathy include dizziness, shortness of breath, and heart attacks. Symptoms are aggravated by running around, lifting things, and excessive movement.

129.     With medication, Mr. Hatton is still unable to exert extreme pressure on his heart but is able to perform regular daily activities. His condition requires testing every 6 months and, if the condition progresses he will require open heart surgery.

130.    Mr. Hatton's Hypertrophic Cardiomyopathy is a disability for purposes of the MHRA and the ADA. In particular, his condition substantially limits major life activities such as the functioning of his heart, particularly when viewed in the absence of mitigating measures.

131.    Mr. Hatton's request for unpaid leave was a protected request for reasonable accommodation for the purposes of the MHRA and ADA.

132.    Mr. Hatton's use of unpaid leave was a reasonable accommodation for purposes of the MHRA and ADA.

133.    On September 29, 2023, Ms. McCullough emailed Mr. Hatton to schedule a meeting for October 5. This was the first response Mr. Hatton received to his request for accommodation.

134.    On October 5, 2023, Mr. Hatton met with Ms. McCullough and Ms. Ward. They informed Mr. Hatton that they were "exercising their right to eliminate his role".

135.    Mr. Hatton was given 48 hours to move out of manager housing despite the fact that he had signed an employee housing agreement which provided for thirty days of notice.

136.    Mr. Hatton was terminated one day before he returned to work from his protected FMLA leave.

137.    Mr. Hatton's termination was clear FMLA interference and disability discrimination and also constituted an unlawful failure to accommodate.

138.    Terminating Mr. Hatton because he requested and needed the reasonable accommodation of unpaid medical leave rendered the accommodation ineffective.

139.    Defendant terminated Mr. Hatton because of his disability.

140.    Defendant terminated Mr. Hatton in retaliation for requesting and needing reasonable accommodation.

141.    The evidence also reflects that the termination of Mr. Hatton was further retaliation for his protected reports.

142.    Although Defendant informed Mr. Hatton that the reason for his termination was that they were eliminating his role, in an unemployment hearing Defendant stated that Mr. Hatton's termination was due to poor work performance.

143.    The fact that Defendant changed their explanation is strong evidence of pretext.

144.    While Mr. Hatton was out on protected leave, Terramor hired another employee to fill in for him.

145.    On October 20, 2023, Mr. Hatton was informed by a former coworker that Ms. McCullough offered this employee the full-time Food and Beverage Manager position (the role they had allegedly eliminated), but this employee rejected the offer.

146.    A posting was also listed on Indeed for a Food and Beverage Manager position in the Bar Harbor area.

147.    Mr. Hatton's position was not, in fact, eliminated.

148.    Additionally, it is implausible that Mr. Hatton's position would have been eliminated. The Food and Beverage Manager position, or a position with comparable responsibilities, is necessary to the functioning of Terramor.

149.    Terramor's claim that Mr. Hatton's position was eliminated was an attempt to cover up the illegal motives for Mr. Hatton's termination.

150.    As a result of Defendant's unlawful actions, Hatton has suffered lost wages and benefits.

151.    As a result of Defendant's unlawful actions, Hatton lost his company provided housing and so has subsequently needed to pay for housing at a rate of $1,800 per month that would otherwise have been provided for free as a benefit of his employment.

152.    As a result of Defendant's unlawful actions, Hatton also lost the benefit of receiving board (food) with a value of $100 per week.

153.    As result of Defendant's unlawful actions, Hatton has been required to pay more out of pocket costs for healthcare than he would have been required to pay when he was covered by Defendant's health insurance.

COUNT I – ADA-Discrimination

154.    Paragraphs 1-153 are incorporated by reference.

155.    Defendant engaged in unlawful disability discrimination.

COUNT II - ADA Failure to Accommodate

156.    Paragraphs 1-155 are incorporated by reference.

157.    Defendant's conduct violated its duty under the ADA to engage in the interactive process and to provide reasonable accommodations.

COUNT III - ADA Retaliation

158.    Paragraphs 1-157 are incorporated by reference.

159.    Defendant's conduct violated Plaintiff's right to be free from retaliation for exercising his rights under the ADA.

COUNT IV - FMLA Interference

160.    Paragraphs 1-159 are incorporated by reference.

161.    Defendant's conduct violated Plaintiff's rights under the FMLA to protected medical leave and reinstatement to his same position following the conclusion of the leave.

## COUNT V: FMLA Retaliation

162.    Paragraphs 1-161 are incorporated by reference.

163.    Defendant's conduct violated Plaintiff's right to be free from retaliation for exercising his rights under the FMLA and Plaintiff's medical leave was a negative factor in Defendant's decision to terminate his employment.

## COUNT VI – MHRA Failure to Accommodate

164.    Paragraphs 1-163 are incorporated by reference.

165.    Defendant's conduct violated its duty under the MHRA to engage in the interactive process and to provide reasonable accommodations.

## COUNT VII – MHRA Discrimination

166.    Paragraphs 1 – 165 are incorporated by reference.

167.    Defendant has engaged in unlawful disability discrimination.

## COUNT VIII– MHRA Retaliation

168.    Paragraphs 1-167 are incorporated by reference.

169.    Defendant's conduct constitutes unlawful retaliation and Defendant violated the MHRA's prohibition against interfering with any individual in the exercise or enjoyment of the rights granted under the MHRA.

## COUNT IX - MWPA/MHRA Retaliation

170.    Paragraphs 1-169 are incorporated by reference.

171.    Defendant violated the MWPA by retaliating against Plaintiff because he engaged in protected activity under the MWPA, as enforced through the MHRA.

## COUNT X - TITLE VII Retaliation

172.    Paragraphs 1-171 are included by reference.

173.    Defendant violated Plaintiff's right to be free from retaliation for reporting discrimination on the basis of sex.

<u>PRAYER FOR RELIEF</u>

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendant to be in violation of his rights;

B.    Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendant to award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's discrimination;

E.    Award equitable-relief for back pay, lost benefits (including but not limited to lost housing, board, and medical insurance), and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award enhanced compensatory damages in an amount to be determined at trial;

H.    Award liquidated damages;

I.    Award nominal damages;

J.    Award attorneys' fees, including legal expenses, and costs;

K.    Award prejudgment interest;

L.    Permanently enjoin Defendant from engaging in any employment practices which discriminate on the basis of disability and/or serious health conditions;

M.    Require Defendant's owner to mail a letter to all employees notifying them of the verdict against it and stating that Defendant will not tolerate retaliation or discrimination in the future;

N.      Require that Defendant post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

O.      Require that Defendant train all management level employees on the prohibitions against discrimination and retaliation set out in the MHRA, MWPA, ADA, Title VII, and FMLA;

P.      Grant to Plaintiff such other and further relief as may be just and proper.


                                        Respectfully submitted,

Dated: October 1, 2025

                                        /s/ Chad T. Hansen
                                        Chad T. Hansen

                                        Attorney for the Plaintiff

                                        EMPLOYEE RIGHTS GROUP
                                        92 Exchange Street 2nd floor
                                        Portland, Maine 04101
                                        Tel. (207) 874-0905
                                        Fax (207) 874-0343
                                        Chad@EmployeeRightsLaw.Attorney